******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* CHARLES GAMER
(AC 35617)

Lavine, Keller and Borden, Js.

*Argued April 15—officially released August 5, 2014*

(Appeal from Superior Court, judicial district of
Stamford-Norwalk, geographical area number twenty,
Hudock, J.)

*Andrew B. Bowman*, for the appellant (defendant).

*Melissa Patterson*, assistant state's attorney, with
whom, on the brief, were *David I. Cohen*, state's attor-
ney, and *Donna M. Krusinski*, assistant state's attorney,
for the appellee (state).

*Opinion*

LAVINE, J. This case turns on the maxim that, although the trial court must assiduously defend an accused's right to counsel, the accused must not be permitted to manipulate that right so as to obstruct the orderly procedure of the court or to interfere with the fair administration of justice. See *United States* v. *Bentvena*, 319 F.2d 916 (2d Cir.), cert. denied sub nom. *Ormento* v. *United States*, 375 U.S. 940, 84 S. Ct. 345, 11 L. Ed. 2d 271 (1963); *State* v. *Beaulieu*, 164 Conn. 620, 627–28, 325 A.2d 263 (1973); *State* v. *High*, 12 Conn. App. 685, 690, 533 A.2d 1217 (1987), cert. denied, 207 Conn. 801, 540 A.2d 74 (1988).

The defendant, Charles A. Gamer, Jr., appeals from the judgment of conviction, rendered pursuant to a guilty plea to larceny in the first degree in violation of General Statutes (Rev. to 2007) §§ 53a-122 and 53a-119 (larceny case).[1] On appeal, the defendant claims that the court abused its discretion by permitting counsel to withdraw his appearance, and consequently violated his right to counsel under the sixth and fourteenth amendments to the United States constitution, and article first, § 8, of the constitution of Connecticut,[2] in the absence of his knowing and voluntary waiver of those rights.[3] We conclude that the court did not abuse its discretion in granting counsel's motion to withdraw and finding on the basis of the defendant's conduct that he waived the right to counsel. We, therefore, affirm the judgment of the trial court.

"[T]he determination of whether there has been an intelligent waiver of the right to counsel must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and *conduct of the accused. . . .* This important decision rests within the discretion of the trial judge." (Emphasis added; internal quotation marks omitted.) *State* v. *Caracoglia*, 95 Conn. App. 95, 103–104, 895 A.2d 810, cert. denied, 278 Conn. 922, 901 A.2d 1222 (2006). To determine whether the court abused its discretion, we have undertaken an exhaustive review of all of the transcripts of the court proceedings in this matter.

The procedural record is lengthy and reveals the following relevant facts, which we set out in detail to provide the complete context of the proceedings. In January, 2009, the defendant was arrested and charged with larceny in the first degree.[4] The defendant posted a $200,000 surety bond on January 30, 2009. Attorney Michael Sherman entered an appearance in the matter, and on February 25, 2009, appeared before the court, *Dennis, J.*, to enter a plea of not guilty and to request a jury trial on behalf of the defendant. Sherman appeared before Judge Dennis again on March 24, 2009, and stated: "This is the second time this matter is down, Your Honor. State's attorney [Suzanne] Vieux that was

here asked me a question about restitution, and it's something that we're going to explore right now. He's going to be dealing directly with the—the victim in this matter, purported victim." The court moved the matter to the pretrial docket.

Sherman appeared before Judge Dennis again on May 6, 2009, and stated: "This is a matter where there's apparently substantial restitution that might be necessary. And I'm asking actually for that same date to see . . . whether or not that's going to be feasible, Your Honor, before putting it on any jury list or anything of that nature." The court set May 28, 2009, for the next court appearance. Sherman and the defendant appeared before Judge Dennis on May 28, 2009, at which time Sherman represented to the court: "Mr. Gamer is present, Your Honor . . . . It's a complicated case where the victim is actually his family, and we're trying to secure . . . means of restitution. And I'm just asking for a brief continuance to June 9 as well."

On June 9, 2009, Sherman stated to Judge Dennis that he had spoken to Vieux "as well as the victim, who is present in court, Your Honor, to agree upon a date. And we've agreed upon July 15, Your Honor." The court agreed to the date and continued the matter on the pretrial docket. Sherman and Vieux appeared in court on July 15, 2009, to request a supervised pretrial. Judge Dennis scheduled the matter for a pretrial to be held before the court, *B. Kaplan, J.*, on August 4, 2009.

On August 4, 2009, the defendant and Sherman appeared before Judge Kaplan, who stated: "Mr. Gamer, we had a big pretrial discussion with regard to this case, and I think we're going to place this matter on the jury list because everybody is so far apart, or [there] doesn't seem to be any way to resolve this case. I will tell you, though, that due to the serious nature of the charge and the large amount of money involved in this case, I would assume that the next judge is going to give it a preference, okay, and the case may be reached soon. I'm going to place this matter on the jury list, and I'm going to continue it until—how's September 24, Mr. Sherman?" Sherman agreed to the date.

On or about September 24, 2009, Sherman filed a motion to withdraw his appearance on behalf of the defendant. In his motion, Sherman stated that "[t]here has been a total breakdown of communication between counsel and client, which has undermined counsel's ability to effectively represent the defendant. . . . Countless calls to the defendant from counsel have been ignored or not returned. . . . In [thirty-three] years of practice, this is the FIRST motion of this nature I have ever filed."

The court, *Hudock, J.*, heard the motion to withdraw on October 29, 2009. The following colloquy took place:

"[Defense Counsel]: I made a motion, Your Honor,

to withdraw appearance. Mr. Gamer is well aware. And I don't think he has an objection.

"The Defendant: No, that's fine.

"The Court: All right, and the claim is that the relationship has broken down?

"[Defense Counsel]: Communication issues, Your Honor.

"The Court: All right, let me see the motion. All right, I'll grant your motion. All right, Mr. Gamer, you are now unrepresented.

"The Defendant: Right.

"The Court: That means you should probably discuss this matter with another attorney. One of these matters is a larceny one that goes back to January 30, 2009; just so that you know. It's very close, if it isn't already, it's not on the hot list yet. But, you're close to being on the one hour for trial list. I will proceed to trial whether you're represented by counsel or not.

"The Defendant: I understand.

"The Court: So, you need to immediately proceed to an attorney's office and seek counsel. I'll continue the matter for, both matters for one week. I want to know what your progress is."

On November 5, 2009, the defendant again appeared before Judge Hudock and the following colloquy took place:

"The Defendant: You did ask me to get an attorney. Michael Corsello is in courtroom C.

"The Court: Okay, all right. So, he's going to file an appearance today.

"The Defendant: That's my understanding. We just— just got to talk. Every—I have contacted, like, nine or ten attorneys. Michael called me back, and he said that no one called up to ask for him to come in. That's all.

"The Court: All right. Well, did you talk to him this morning? . . .

"The Defendant: I didn't know that I was on the short list. I just noticed that when we walked into the door.

"The Court: You are—you are on the short list. . . . So, I'm going to pass the matter. Tell Attorney Corsello we're waiting to see him. . . .

"Attorney Corsello: Yes, we have spoken. We have an appointment.

Unfortunately, I'm going to be out of town until Tuesday. But we do have an appointment scheduled for next week . . . .

"The Court: All right. Well, just so that you know . . . the matter is on the hot list. So, it's not the oldest

file, but it's certainly up there. So, just be aware that if you do file an appearance, the pressure will be on. I mean, I'll give you a reasonable time to prep, as we say. But the time period gets shorter because of your late appearance . . . ." The court continued the case until November 13, 2009, when the defendant next appeared before Judge Hudock without counsel. The defendant represented to the court that he had met with counsel, and that counsel had asked him to appear and request time to prepare the case. The court stated that it did not understand the defendant's request. The following colloquy occurred:

"The Court: Did you hire an attorney or did you not?

"The Defendant: We are in the process of putting some—I have not retained him yet, trying to. Just met on Wednesday night, and then we were trying to meet yesterday and we couldn't.

"The Court: No, I understand that. I also understand that you have a matter that goes back to January of 2009. So, I'll give you until November 30. You'd better have a lawyer in there then."

The defendant appeared without counsel before Judge Hudock on November 30, 2009. He represented that he had additional discussions with Corsello and that another attorney from his firm would be filing an appearance. The court continued the matter until December 7, 2009, stating to the defendant: "Sir, you—you do have one of the older cases on the docket. I am trying to accommodate you in your efforts to get counsel. It does no one any good to come into this . . . as someone representing themselves in my opinion . . . . Even if you were a lawyer. If I were a lawyer charged with a criminal offense, I would have a lawyer standing next to me. . . . You are charged with larceny one. The maximum sentence could be twenty years—state's prison. . . . You're charged with larceny two, issuing bad checks. You need an attorney." The court also entered a plea of not guilty and jury trial election with respect to the bad check case. See footnote 1 of this opinion.

The defendant appeared before Judge Hudock without counsel on December 7, 2009, and stated that he was talking with another attorney. The court stated that the defendant had failed to comply with the court's advice to retain counsel. The court set the matter down for jury selection on January 11, 2010. The defendant, however, did not have an attorney when he appeared before Judge Hudock on January 11, 2010. The court stated to the defendant that he was on twenty-four hour notice to pick a jury, but continued the matter until January 25, 2010. On January 25, 2010, the defendant again was without counsel, and Judge Hudock continued the matter until February 22, 2010. The defendant was still not represented by counsel on February 22,

2010. Vieux informed the court that the state was ready to proceed and that it would object to any continuance counsel retained by the defendant might request. Although Judge Hudock stated that the case could be called for trial in one week, he again continued the matter until March 15, 2010.

On February 25, 2010, however, the case was called for trial. The state represented to Judge Dennis that it was ready to proceed on the charge of larceny in the first degree. The court was aware that Judge Hudock had informed the defendant that the case was on twenty-four hour notice and asked the defendant if he intended to represent himself. The defendant stated: "No, Your Honor."

Judge Dennis asked the defendant how he intended to proceed and identified sixteen dates on which the case had been called since February 25, 2009. The defendant stated that he had spoken to law firms, but he had a problem finding the financial resources to retain an attorney, although he was attempting to liquidate some assets. Moreover, the defendant stated that *an unnamed lawyer had suggested to him* that he apply for a public defender. The court passed the case to permit the defendant to apply for a public defender. When the defendant returned to court, he was accompanied by Attorney Christine C. Schwartzstein of the public defender's office. Schwartzstein stated to the court that the information contained in the defendant's application for a public defender was vague, and that the defendant needed to produce certain bank statements and tax returns. The court passed the matter until the afternoon to provide the defendant an opportunity to obtain information from his and his wife's personal and business accounts. The defendant failed to provide the necessary information when court reconvened in the afternoon and claimed to be confused as to what information was needed.[5] The court instructed Schwartzstein to write down the information the defendant needed to provide the public defender's office to complete his application and continued the matter until the next morning.

The defendant provided the public defender with additional information on February 26, 2010. The public defender's office determined, however, that the defendant was not eligible to receive its assistance due to a "considerable amount" in a business bank account. In the alternative, Schwartzstein volunteered to identify attorneys in the courthouse that day who might be able to represent the defendant. Judge Dennis also asked Schwartzstein to provide the defendant with a list of attorneys he could approach.

The case was again continued until March 12, 2010. The court told the defendant: "[y]ou need to have somebody on board by Friday, March 12, and here, and we will discuss scheduling from there. And, certainly, I'll

try to be flexible with any attorney who is coming on board in terms of other commitments that he or she might have."

When the defendant appeared before Judge Dennis on March 12, 2010, he represented that with the assistance of the public defender's office, he had secured Attorney Matthew L. Brovender to represent him. Assistant State's Attorney Donna M. Krusinski demurred, stating: "But I do want to make the record clear that Attorney Brovender called me personally and said he had agreed to meet with [the defendant, but] he has not been hired yet." The court continued the case until March 26, 2010.

On March 26, 2010, the defendant appeared in court without counsel. Judge Hudock stated that it was his understanding that the defendant had "been canvassed by Judge Dennis as to a waiver of counsel. It is my understanding that you refused to waive your right to counsel; however, I will note as follows: that you have retained Attorney Sherman at one point. You have posted bonds in these matters, you have, on a number of occasions in my presence, been canvassed as to your right to have an attorney. . . . You have been advised on a number of occasions that you should retain counsel.

"I note that Attorney Sherman withdrew as counsel on [October 29, 2009]. I note that you were in court on November 5, November 13, November 30, [December 7], January 11, January 25, February 22, February 25, February 26, [March 12 and March 26]. Each of those occasions, I continued the matter, or Judge Dennis continued the matter, for you to seek the services of counsel. It is my understanding that the latest discussion has been with . . . Brovender. You have apparently not succeeded in hiring Brovender, as of this date. . . . The court finds, as of this moment, that you have, for all intents and purposes, waived your right to an attorney. I will appoint standby counsel for you; that will be Attorney Popilowski. That is standby attorney, sir . . . to be there if you have a question."[6]

The court inquired of the defendant whether he wanted to have an on-the-record discussion with the prosecutor and the court regarding a disposition of the case, "shy of trial . . . ." The defendant stated that "it is wise to do that with counsel." And then responded, "[n]o." He represented to the court that he had spoken with Brovender but had not retained him due to a "financial matter." The defendant expected to take the action necessary to raise the money necessary for Brovender to represent him "in short order."

Vieux stated, however, that Brovender had informed her office that he was not going to represent the defendant. Vieux also stated that if the defendant "wishes to engage in any conversation with regard to resolving

these cases where he does not end up locked up, today is the time to do it. The state really would not be entertaining anything after today, short of incarceration, as a disposition.''

The court addressed the defendant: "I'm willing to discuss with you, and this is totally voluntary on your part, I am willing to discuss with you partial restitution in exchange for a suspended sentence and probation. You would have several months to make a certain amount of restitution, a smaller amount than what I understand is the total amount that is alleged, in exchange for a suspended sentence and probation where the remaining amounts, as verified by the probation department, would be made to the victim to make the victim whole.

"If that is appealing to you, sir, we can have that discussion. If not, if you still wish to seek the services of counsel, then that offer may not be available. It's up to you as to whether you wish to discuss the matter of a suspended sentence and probation, in exchange for a plea of guilty conditioned upon restitution of a percentage of the total alleged. Now is the time to do it.''

In response, the defendant stated: "I would love to talk about that. I just didn't know . . . what was being offered. I didn't know what the nature of the discussion was.'' The court then repeated its plea offer[7] and permitted the defendant time to consider it. The court restated its plea offer and also stated that "[i]f you don't make the restitution, there would be . . . an open plea, which means the state can ask for incarceration.'' The defendant stated, "I understand.'' The court assured the defendant that, if the defendant did not make the initial $25,000 restitution by sentencing, there would be a split sentence, "as we call it, to be divided between incarceration and probation.'' The court informed the defendant that the total restitution consisted of $227,863.24 in the larceny case plus $7070 in the bad check case.[8] The defendant stated that he understood that he would go to prison if he did not pay $25,000 by the time he was sentenced and that the plea offer "[s]eems fair . . . .'' The court continued the matter until 2 p.m. for the defendant to consider its plea offer.

The defendant returned to court at 2 p.m. and stated, "I would like to move forward with the offer. . . . And I did have a chance *to talk to those who, I would say, advised me.* I did have a couple of questions that I needed to pose to you; I think that is the proper way.'' (Emphasis added.) The court permitted the defendant to ask questions regarding the plea offer.

In response to the defendant's inquiry as to whether the probation office would perform a forensic accounting, the court stated that it would order the probation office to verify the not-to-exceed amount of restitution it would order. The court stated that it would order the

probation office to verify the amount due.

The defendant asserted that the amount of restitution due on the larceny case was inaccurate. The court informed the defendant that he could bring that issue to the attention of the probation office. The defendant also stated that there was a letter stating that the victim owns a percentage of the company in return for an investment. He asked the court to void that purported agreement. The court declined to become involved, questioning whether it had jurisdiction in the matter. The defendant also stated that he did not believe that the complaining witness in the bad check case had performed all of the services he claimed. The court advised the defendant to consult with an attorney to "seek advice on the civil side."

During the luncheon recess, the defendant met with Vieux, who represented that if he accepted the court's plea offer, the state would accept the defendant's guilty plea in the larceny case and enter a nolle prosequi in the bad check case. The defendant would be required to pay restitution in both files. See footnote 7 of this opinion. They appeared before the court in the afternoon and agreed on a sentencing date in July, 2010.

Thereafter, the defendant withdrew his prior plea of not guilty and election of a jury trial. The defendant pleaded guilty to larceny in the first degree in accordance with the facts in the arrest warrant as recited by Vieux.[9] The court canvassed the defendant[10] and stated: "I should indicate to you that you are giving up rights. You are giving up your right to be represented by counsel. You represent yourself, is that correct?" The defendant responded affirmatively.[11] After canvassing the defendant, the court found that his guilty plea was knowingly, voluntarily, and intelligently made, and that he knowingly, voluntarily, and intelligently waived the right to counsel. The court accepted the defendant's guilty plea to larceny in the first degree and ordered sentencing for July 22, 2010. The court instructed the defendant to speak with the probation office upon leaving the courtroom and asked if he had any questions. The defendant stated: "Nope, I appreciate your patience, and I know that I have tested that."

Judge Hudock called the parties back to court on April 14, 2010, and stated that during his canvass of the defendant, he had failed to ask certain questions. The court vacated the defendant's guilty plea in the larceny case.[12] The court asked the defendant if he still wanted to plead guilty to the charge of larceny in the first degree. The defendant stated: "I do." The defendant pleaded guilty, Krusinski stated the factual basis of the charge, and the court recited the terms of the plea agreement. The court inquired of the defendant whether the agreement was the one he had reached with the state.

The defendant stated: "We also had a piece in there about probation would perform an audit. And *I've contacted two forensic accounting firms* to take a look at the numbers because I don't in any shape or form agree with the numbers. I agreed with what I did with the plea . . . ." (Emphasis added.) The court addressed additional questions to the defendant, who agreed with the plea terms as stated by the court. After the court addressed one of the defendant's questions,[13] the court continued its canvass of the defendant, which included the elements of the crime of larceny in the first degree. The defendant responded in the affirmative when asked whether he understood that he did not qualify for the services of a public defender, that *he had decided to represent himself*, and that he was giving up certain rights. The defendant agreed that *no one had threatened him and that his plea was voluntary.*

The court reminded the defendant that paying $25,000 partial restitution prior to sentencing was a critical part of the plea agreement. The defendant then asked the court how it came up with that number. The following colloquy then occurred:

"The Court: I did not come up with that number. The number was reached between you and the prosecutor's office.

"The Defendant: I heard about it first from you. That's the reason I was asking where that number came from.

"The Court: That was not my understanding.

"[Assistant State's Attorney Krusinski]: Not mine, either. My supervisor, Attorney Vieux, stated that she had spoken to [the defendant] before he pled, and it was [an] agreed upon number.

"The Defendant: You know, it's fine. I just didn't know . . . where the number came from.

"The Court: No, no, you said, you said the magic words. So, at this point, everything is vacated. And is Mrs. Vieux going to be here tomorrow?

"[Assistant State's Attorney Krusinski]: Yes, I will not be here, and this is my trial file."

The court ordered the defendant to return to court the next day. The following colloquy occurred:

"The Defendant: You know what, I may be wrong.

"The Court: You did not discuss this $25,000, that's your statement. You did not discuss the $25,000 figure with prosecutor Vieux. That is contrary to what I understood, what I knew at the time that the original plea was taken. Now, you've said for the record that that was not your agreement; that I just threw that figure out. You've asked me how I came up with that figure. And I've told you how I came up with that figure, which was, it was my understanding that you had discussed

that disposition with prosecutor Vieux.

"The Defendant: I'm not trying to throw a wrench in this.

"The Court: No.

"The Defendant: I'd like to proceed, but I just, I may be wrong, okay. I may be wrong. I just didn't know where the number came from. And if it was a number that they have decided on, I thought it was a practice of law, not a . . . .

"[Assistant State's Attorney Krusinski]: Your Honor, if I may, I know I was not here on the date of the plea; however, court personnel [were] here, and if he had a question of the $25,000, it should have been brought up the first time you pleaded, sir. How is it, suddenly, now, something you don't understand?

"The Defendant: Well, because the last time I was in front of the judge, there was—it was a little bit of a different situation. He made it very clear that I was to proceed with this case, and that I would be brought back into a courtroom every time there was a court case in session, and I would have to observe that if I was going to be . . .

"[Assistant State's Attorney Krusinski]: But that's not what I'm asking you. I'm asking you about the $25,000. When you pled guilty on the last court date, the $25,000 was put on the record in front of staff, in front of public defenders. They all heard it put there. You could've questioned it at that moment. What has changed from three weeks ago till today that it's a new number to you?

"The Defendant: I have a chance to ask a question about that amount. I didn't know where that amount came from. I thought it was something that was established by a practice of law, not something that was decided by a prosecutor. I didn't remember having the discussion with her. And I'm not trying to throw a wrench in this . . . . I simply don't think I asked. I should've asked that question before. I would've gotten clarity back then, and now, I'm just asking."

The court vacated the defendant's plea and ordered the defendant to return to court the next day to speak with Vieux. If the defendant and Vieux agreed, the court would recanvass the defendant.[14] The matter was continued until April 16, 2010, when the defendant and Vieux appeared before Judge Hudock.

The court stated that it presumed that the defendant had met with Vieux the previous day and asked the defendant what he wanted to do.

"The Defendant: . . . I've *had a chance to talk to a legal adviser*, and I have to admit, I think after meeting with the prosecutor yesterday, I am more confused than . . . than when were . . . not confused . . . more so . . . more questions than ever. . . .

"The Court: . . . If you're confused, then you're back on trial. You're back on the jury list. You will be here Monday morning . . . by 10. You will be sitting in this courtroom. You will be watching other trials. You will be here every day after that to watch trials. There will be two trials. You will be here from 10 until the end of the court day each of those days. And then, when those two trials are completed, you will begin picking a jury. I'm doing this so that you can be witness to the court proceedings in a trial, in two trials. One is a court trial, and one is . . . a jury trial. You should pay attention to how juries are selected. You should pay attention as to how witnesses are examined and cross-examined. Thank you. See you Monday." (Emphasis added.)

Before the proceeding concluded, however, Vieux stated that the defendant had represented that he had consulted a forensic accountant with respect to the amount of restitution. She requested in an oral motion for discovery that the defendant disclose his witness list so that the state could conduct an investigation prior to trial. The following colloquy occurred:

"The Court: All right. You indicated on the record on Wednesday that you had retained the services of a couple of forensic accountants, if I recall correctly, as it related to the amount of restitution that the . . . state's attorney was claiming. You should put those names and addresses on the record at this point.

"The Defendant: Your Honor, considering the fact that we were talking about working with probation, that was three or four months out, I haven't secured them completely because it's the middle of tax season. I did already talk to the accountant, and I can give you his name. His name is Nick Pugliski. He's an accountant in White Plains [New York]. I'll give you the contact information. He's familiar with this. But we haven't scheduled a time to do it because [*I*] *didn't know that this was coming to trial in the next couple of days*. We thought that this was something we'd work on with the probation group and that gave everybody a . . . you know, at least another thirty days to start to . . . or get the work done. This is . . . again, *this is just speeding everything back up again*, and this is what I think led to the confusion that we had and why I had been brought back in on this past Wednesday. . . .

"The Court: Sir, I did not speed anything up. I indicated to you that I had failed to ask you a couple of questions on the canvass, and so I reopened the canvass.

"The Defendant: Then . . . I am . . . mistaken."

The court addressed the defendant at length with respect to the defendant's assertion that the court was speeding things up.[15] The defendant was given an opportunity to make a statement in which he stated, in part: "I want this over as much as anybody else. But economic

conditions in my life, economic conditions for a lot of people, meant that I didn't have the money to go forward with a private attorney. I applied for a public defender, okay. It was determined based on a bank account that my wife had for her business, which is now a third of what it was before, was enough reason not to award a public defender."

Vieux thereafter read from the March 26, 2010 transcript of the defendant's plea, specifically noting the details of the $25,000 restitution required prior to sentencing. She expressed annoyance with the defendant and agreed with the court that the defendant was stalling. Vieux stated that the state would now request that the defendant's sentence include a period of incarceration and that it was no longer willing to nolle the charges in the bad check case. The court explained in detail to the defendant the state's change in its position. Despite the fact that the state withdrew its support of the plea agreement, the court stated that it was willing to "stick by the previous . . . agreement" if the defendant wanted it, but it was not willing to "put up with this again. Because it's telling me that once again, you have a tendency to stall, stall, stall, and stall." The court stated that the defendant had until Monday to consider the plea agreement the court was offering.

The defendant and Krusinski appeared before Judge Hudock on April 19, 2010, when the defendant pleaded guilty. Krusinski stated for the record: "The state is asking for ten years suspended, five years [of] probation, a presentence investigation to be ordered, a $25,000 good faith restitution payment due on that date and then restitution as found to be owed by probation for the rest of his five years, to pay it back." If the defendant did not pay $25,000 in restitution by the date of sentencing, the state would seek an open plea not to exceed ten years of incarceration. The court ordered the defendant to state his understanding of the disposition of the larceny case.

The defendant stated his understanding of the disposition: "The disposition is, I am pleading guilty to larceny one, and there is a $25,000 payment required before sentencing. . . . And if that is not paid, there is an open plea and the state has its right to prosecute me to the fullest extent." The court corrected the defendant, stating that the state could seek twenty years in prison, but that it was limiting the time in the defendant's case to ten years. The defendant stated that he understood that the state was willing to leave the restitution open to permit the probation office to verify out-of-pocket expenses of the complainant. He also stated that he understood that the prosecutor set the amount of $25,000 due at the time of sentencing and that he had agreed to that figure. Moreover, the defendant stated that he had no questions about the plea agreement offered to him.

During the ensuing plea canvass, the defendant *affirmed that he was not represented by an attorney and that he wanted to proceed without the assistance of counsel.* The court informed the defendant of the elements of the crime of larceny in the first degree, and that it carried a maximum penalty of twenty years in prison and a fine not to exceed $15,000. The court informed the defendant of the constitutional rights that he was giving up, including the right to counsel, the right to be tried by a jury with the assistance of counsel, the right to present a defense, and the right to have the state prove him guilty beyond a reasonable doubt, among others. The defendant affirmed that he wanted to relinquish those rights and that his plea was voluntary. Krusinski stated the factual basis of the larceny case and the bad check case. The defendant admitted that the essential facts as stated were accurate, that the larceny exceeded $10,000, and that he was pleading guilty because he was guilty. The court found that the defendant's guilty plea was made knowingly, voluntarily, and intelligently. The court ordered a presentence investigation and set sentencing for July 22, 2010.

The defendant, Krusinski, and the victims appeared before Judge Hudock on July 22, 2010. The defendant stated, "[n]o," when the court asked him if the $25,000 restitution was forthcoming. Thereafter, the victims addressed the court,[16] and Krusinski set out the factual basis for each of the charges against the defendant. Krusinski stated that in his written statement the defendant showed no remorse and blamed his family for his situation. Krusinski also stated that the defendant had attended Pepperdine University, has owned businesses, and claimed to have been the president of several companies. On behalf of the state, Krusinski asked the court to sentence the defendant to ten years in prison, execution suspended after three years, and five years of probation with the condition of restitution.

The defendant made a lengthy statement in which, for the first time in all of the extended proceedings, he essentially denied taking money from his mother. He claimed that his mother gave him money as an investment in his new business and that she has a document demonstrating the number of shares she has in the corporation.[17] The defendant represented that his mother agreed to pay the interest on the money she gave him. He claimed that he helped his mother manage the refinancing of a nursing home, deal with unions, and renegotiate a buyout. He also claimed that his mother and sisters benefited financially from the time he dedicated to helping his mother with the nursing home[18] and that they were ungrateful. He claimed to have been used by his mother and sisters, and that he was quite upset about the manner in which they had treated him.[19]

The defendant stated that no forensic investigation

was ever conducted regarding the amount taken from his mother's account. More specifically, the defendant stated: "I believe that we had an agreement with the court when you and I met that said I will have probation perform forensic accounting to determine what the appropriate restitution should be." At that point, the court interrupted the defendant, and the following colloquy occurred:

"The Court: First of all, when we met, we were in a courtroom at the time and you were being canvassed. Is that correct?

"The Defendant: Sure.

"The Court: All right. Well, let's be specific about when we met. . . . We were in court, and I canvassed you.

"The Defendant: Mm hmm.

"The Court: And I indicated to you as follows because you questioned me at length on this point, and I indicated to you that it would be verified by the probation department, restitution, but that under any circumstances, you were to make a down payment, a good faith payment in the amount of $25,000; that once you . . . had paid that down payment and that probation had determined an amount that you needed to pay, that would be the amount. So, you and I did not agree that prior to this date there would be some sort of forensic analysis. The verification by the probation department as to what you would owe would be performed upon the starting of your probation.

"That was . . . made perfectly clear to you, sir. You questioned me on it, and I answered. So, let's be accurate in your representations because I noticed that you made reference to this in your statement, and it is not—it is not a condition—precondition to sentencing that that verification take place. Do you understand that?

"The Defendant: Well, that wasn't my understanding at the time, and that's why I wrote it down here."

The defendant continued his lengthy statement: "Now, if I've forgotten anything, it's because I understand that I've been talking for quite a long time. But I did cover everything in this document. I did receive some advice from an attorney that this would be something that would be very, very important because as you and I discussed in the past, I didn't really have a chance to ever tell my side of the situation. It was, you did something wrong, you should be punished, and that's it. . . .

"And I stand by my statement. . . . [T]here was nothing done illegal. I did everything by the book. In fact, we contacted—my former attorney contacted the FBI, and we asked why they didn't get involved, and they said because there wasn't any forgery. I didn't take checks. I had simply walked into a bank that my mother

had contacted and had met and knew these people, and she approved $90,000 to be withdrawn. And they put the checks together. They wrote my name on it, and they wrote the company name on it. I signed them and cashed them, and I told my mom what was going on. . . . [T]hat's exactly the truth."

When the defendant concluded his statement, the court addressed him stating: "All right. You've entered a plea of guilty to larceny in the first degree. Your plea was found to be knowing, voluntary, and intelligent. You have waived your rights to an attorney. You waived your rights to trial. You were canvassed on a number of occasions. And I'll put on the record, I indicated to you on any number of times prior to your plea of guilty, that you should seek counsel. You have forgone all of that. . . .

"You have voluntarily, knowingly, waived all of those rights. You are an intelligent individual. It should not have taken you a road map to figure out the rights you were giving up. But I provided you that road map over a fair number of months. So, don't tell me, at this point, that you have been prevented from presenting your case. Don't tell me that you have been prevented from investigating what needs to be investigated, in your opinion.

"I note that in November of 2004, you were convicted of issuing bad checks. You were given a probationary term and a $500 fine, as well as a $1000 fine. I note that you were offered from the state, the sentence in the alternative, that in exchange for $25,000 to be presented to the probation department, the state was willing to recommend a suspended sentence and probation, an extremely generous offer, by the way, in light of the amount that was alleged to have been taken in this case, extremely generous. You have failed to avail yourself of that offer. You knew fully well that the state would be looking for incarceration. It would be an open plea. There is absolutely no doubt in my mind that you knew all of this was . . . going to happen today. Don't tell me that you were tops in your class, that you are the creator of very successful companies, and that you don't know the slightest thing of what was going to happen today. Don't tell me that. . . . [T]hat offends my sense of what's right and wrong.

"You, sir, have played games with the court. You have twisted the truth. You have laid all of the blame upon your elderly mother. You have placed the blame on everyone else except yourself. That is the court's opinion. You have left your family without this money. You have left Dr. Hodish without his money. You've sought to delay this matter. You've delayed it and delayed it. Pled guilty and delayed it again in the hopes that at some point, somehow, you would avoid your responsibility. That time has ended. And you've been given every opportunity by this court, by other courts, by the prose-

cution, to avoid a prison sentence, every opportunity under the sun.

"I would note that this file has been pending now for about two years, if I'm not mistaken. No one has pushed you into anything. No one has forced you into this agreement. You voluntarily gave up your rights." The court then sentenced the defendant.[20]

On February 14, 2011, the defendant, through counsel, filed a petition for a writ of habeas corpus.[21] On April 11, 2013, the habeas court, *Hon. George Levine*, judge trial referee, granted the petition and restored the defendant's right to appeal pursuant to a motion for stipulated judgment. The defendant filed this appeal in accordance with the writ of habeas corpus.

On appeal, the defendant claims that the court abused its discretion by denying him the constitutional right to counsel in that (1) the court granted Sherman's motion to withdraw as counsel, and (2) he did not (a) clearly and unequivocally ask to represent himself, and (b) knowingly and voluntarily waive his right to counsel. We disagree.

I

The defendant claims that Judge Hudock improperly granted Sherman's motion to withdraw, which failed to conform with Practice Book § 3-10,[22] and that the court failed to find good cause to grant the motion. We agree with the defendant that Sherman's motion to withdraw did not conform with § 3-10, and that, before granting the motion, the court should have found good cause to grant it. We conclude, however, that if permitting Sherman to withdraw was error, it was harmless.

The standard of review regarding a motion to withdraw as counsel is abuse of discretion. "The standard of reviewing both a motion by a defendant to discharge counsel and a motion by counsel to withdraw is the same. . . . It is within the trial court's discretion to determine whether a factual basis exists for appointing new counsel and, absent a factual record revealing an abuse of that discretion, the court's refusal to appoint new counsel is not improper. . . . Such a request must be supported by a substantial reason and, [i]n order to work a delay by a last minute discharge of counsel there must exist exceptional circumstances." (Internal quotation marks omitted.) *State* v. *William B.*, 76 Conn. App. 730, 747, 822 A.2d 265, cert. denied, 264 Conn. 918, 828 A.2d 618 (2003).

"In evaluating whether the trial court abused its discretion in denying [the] defendant's motion for substitution of counsel, [an appellate court] should consider the following factors: [t]he timeliness of the motion;[23] adequacy of the court's inquiry into the defendant's complaint; and whether the attorney/client conflict was so great that it had resulted in total lack of communication preventing an adequate defense." (Footnote added;

internal quotation marks omitted.) *State* v. *Williams*, 102 Conn. App. 168, 205, 926 A.2d 7, cert. denied, 284 Conn. 906, 931 A.2d 267 (2007).

In his appellate brief, the defendant identified every way in which Sherman's motion to withdraw failed to comply with Practice Book § 3-10, but failed to explain how he was harmed by the motion's failure to comply with the rule of practice. The purpose of the notice provision of Practice Book § 3-10 (a) and (b) is to inform the court, other attorneys of record, and the party represented by the attorney that he or she is seeking permission to withdraw. Section 3-10 also requires that attorneys of record and the party represented by the withdrawing counsel be informed of the date and time of the hearing. The transcript of the October 29, 2009 hearing at which the court granted Sherman permission to withdraw reveals that Vieux and the defendant were present. Sherman's failure to include the date and time of the hearing, therefore, did not prejudice the defendant.

After the court granted Sherman permission to withdraw, the court informed the defendant that he was no longer represented by counsel, that he immediately should proceed to an attorney's office and seek counsel. The court also stated that the case was close to being put on the one hour trial list. The court's instructions to the defendant remedied Sherman's failure to inform the defendant of the consequences of his withdrawal.

Sherman's motion represented that "[t]here has been a total breakdown of communication between counsel and client, which has undermined counsel's ability to effectively represent the defendant." During the hearing, Sherman stated that the defendant was well aware of the motion. The court made no explicit good cause finding to permit Sherman to withdraw his appearance beyond stating that "the relationship has broken down . . . ." The defendant, however, did not object or otherwise give the court reason to doubt Sherman's representations. In fact, he stated, "that's fine," following Sherman's representation.

A trial court is entitled to rely on the representations of counsel, who is an officer of the court. See *State* v. *Hall*, 303 Conn. 527, 536, 35 A.3d 237 (2012). "[I]t has long been the practice that a trial court may rely upon certain representations made to it by attorneys, who are officers of the court and bound to make truthful statements of fact or law to the court." (Internal quotation marks omitted.) *State* v. *Chambers*, 296 Conn. 397, 419, 994 A.2d 1248 (2010); see also *State* v. *Hall*, supra, 536–37 (defendant's failure to contest factual representations of his attorney demonstrated acquiescence in attorney's statements and supported trial court's reliance on them); *State* v. *Baker*, 141 Conn. App. 669, 673, 62 A.3d 595 (same), cert. denied, 308 Conn. 950, 67 A.3d 292 (2013). Moreover, the full record in this matter

discloses that the defendant was not reticent when he wanted to address the court. "[I]t is well established that [o]ur rules of procedure do not allow a [party] to pursue one course of action at trial and later, on appeal, argue that a path [the party] rejected should now be open to him." (Internal quotation marks omitted.) *State* v. *King*, 149 Conn. App. 361, 375, 87 A.3d 1193, cert. granted on other grounds, 312 Conn. 917,    A.3d (2014).

Our conclusion that the court neither abused its discretion nor deprived the defendant of his right to counsel finds support in *State* v. *Fernandez*, 254 Conn. 637, 758 A.2d 842 (2000), cert. denied, 532 U.S. 913, 121 S. Ct. 1247, 149 L. Ed. 2d 153 (2001). *Fernandez* is procedurally different in that defense counsel there made an *oral* motion for permission to withdraw. During the hearing before the trial court in that case, *Espinosa, J.*, withdrawing counsel represented to the court that the motion to withdraw was "mutually agreed upon." (Internal quotation marks omitted.) Id., 641. Counsel also represented that the defendant could retain new counsel in two weeks. The defendant in *Fernandez*, like the defendant here, did not object.[24] In reviewing the claim that the defendant in *Fernandez* was deprived of the counsel of his choice, our Supreme Court reasoned: "By failing to raise the issue [at the trial court level], where a factual basis could have then been developed, [the] defendant rendered it impossible for us to deal meaningfully with his eleventh hour contention that he was wrongfully deprived of the counsel of his choice." (Internal quotation marks omitted.) Id., 650.

Another similarity between *Fernandez* and this case is that both defendants were given time to secure new counsel. Our Supreme Court concluded that two weeks was a reasonable period of time in which the defendant in *Fernandez* could secure new counsel. Id. In this case, Judge Hudock and Judge Dennis repeatedly continued the case over a period of five months to enable the defendant to retain new counsel.

The defendant further notes that Sherman's motion was deficient in that it did not state that, if it were granted, he should ask the court to appoint new counsel, obtain another lawyer or file an appearance. We again conclude that the defendant was not harmed by Sherman's omission, as the court instructed the defendant to find another lawyer immediately because the case was about to be placed on the "hot list" for trial. The court monitored the defendant's initial effort to retain new counsel by continuing the case for one week. When the defendant appeared before the court at that time, he stated that the court "asked me to get an attorney" and that he had spoken to a lawyer who was in another courtroom at the time. The defendant clearly was aware of the need to retain new counsel and was not harmed

by the deficiency in Sherman's motion.

At the conclusion of the proceeding on October 29, 2009, Judge Hudock stated that the case would "proceed to trial whether [the defendant] was represented by counsel or not." The defendant claims that those words constituted a threat and demonstrated the court's disregard for his right to the assistance of counsel. We disagree. Although the court's warning may have been stated bluntly, there is precedent for such admonitions. See, e.g., *State* v. *Flemming*, 116 Conn. App. 469, 475, 976 A.2d 37 (2009) ("If you don't have a lawyer here to represent you on that date, you're going to represent yourself. I'm going to find at that point that you waived your right to have a lawyer represent you unless I hear something different . . . ." [Internal quotation marks omitted.]). Despite the defendant's claim, the record amply demonstrates that the court acutely was aware of the defendant's right to counsel, and repeatedly advised him to retain new counsel and continued the matter to enable him to do so. We cannot conclude that the court's realistic assessment of what would happen prejudiced the defendant.

In conclusion, although we agree that Sherman's motion and the court's granting of the motion did not conform with Practice Book § 3-10, the defendant was not harmed when the court granted Sherman permission to withdraw, as the court provided the defendant all of the protections required by § 3-10. Moreover, both Judge Hudock and Judge Dennis granted the defendant continuances and multiple opportunities over five months to retain substitute counsel before the case was called for trial. Judge Dennis also referred the defendant to the Office of the Public Defender.

## II

The defendant also claims that the court violated his constitutional right to counsel in the absence of his voluntary and knowing waiver of that right. The defendant argues that he never waived his right to counsel and never sought by word or deed to represent himself. We agree that the defendant never expressly asked to represent himself. Judge Hudock found that, by refusing to retain new counsel after Sherman withdrew, the defendant sought to stall the judicial process. We agree and, therefore, conclude that the defendant, by his conduct, waived his right to counsel and that the court did not violate his constitutional right to counsel.

We begin with the applicable standard of review. "[T]he determination of whether there has been an intelligent waiver of the right to counsel must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused. . . . This important decision rests within the discretion of the trial judge." (Internal quotation marks omitted.) *State*

v. *Flemming*, supra, 116 Conn. App. 477–78. "We review [a] trial court's determination with respect to whether the defendant knowingly and voluntarily elected to proceed [as a self-represented party] for abuse of discretion." *State* v. *D'Antonio*, 274 Conn. 658, 709, 877 A.2d 696 (2005).

Our Supreme Court has identified "several well settled principles regarding the constitutional right of an accused to represent himself. The right to counsel and the right to self-representation present mutually exclusive alternatives. A criminal defendant has a constitutionally protected interest in each, but since the two rights cannot be exercised simultaneously, a defendant must choose between them. When the right to have competent counsel ceases as the result of a sufficient waiver, the right of self-representation begins. . . . Put another way, a defendant properly exercises his right to self-representation by knowingly and intelligently waiving his right to representation by counsel. . . . When an accused manages his own defense, he relinquishes, as a purely factual matter, many of the traditional benefits associated with the right to counsel. For this reason, in order to represent himself, the accused must knowingly and intelligently [forgo] those relinquished benefits. . . . The state bears the burden of demonstrating that the defendant knowingly and intelligently waived his right to counsel." (Citations omitted; internal quotation marks omitted.) *State* v. *T.R.D.*, 286 Conn. 191, 202–203, 942 A.2d 1000 (2008).[25] The defendant does not claim that he was not competent to waive his right to counsel. We therefore focus on whether the defendant voluntarily and knowingly waived the right to counsel. See *State* v. *Henderson*, 307 Conn. 533, 547, 55 A.3d 291 (2012).

"For a court to determine that a defendant has validly waived his right to counsel, it must be satisfied that such a waiver was made knowingly, voluntarily and intelligently. In making such a determination, the court is guided by Practice Book § 44-3, which provides in relevant part: A waiver will be accepted only after the judicial authority makes a thorough inquiry and is satisfied that the defendant: (1) [h]as been clearly advised of the right to the assistance of counsel, including the right to the assignment of counsel when so entitled; (2) [p]ossesses the intelligence and capacity to appreciate the consequences of the decision to represent oneself; (3) [c]omprehends the nature of the charges and proceedings, the range of permissible punishments, and any additional facts essential to a broad understanding of the case; and (4) [h]as been made aware of the dangers and disadvantages of self-representation. Our Supreme Court has held, however, that a defendant does not possess a constitutional right to a specifically formulated canvass [with respect to this inquiry]. His constitutional right is not violated as long as the court's canvass, whatever its form, is sufficient to establish

that the defendant's waiver was voluntary and knowing. . . . In other words, the court may accept a waiver of the right to counsel without specifically questioning a defendant on each of the factors listed in Practice Book § [44-3] if the record is sufficient to establish that the waiver is voluntary and knowing." (Internal quotation marks omitted.) *State* v. *Flemming*, supra, 116 Conn. App. 478–79.

Judge Hudock found that the defendant had intelligently, voluntarily and knowingly waived the right to counsel. The record contains facts that support the court's finding. At the time the court granted Sherman permission to withdraw on October 29, 2009, it advised the defendant to find new counsel. The next time the defendant appeared in court, he stated that the court had "asked [him] to get an attorney." On November 30, 2009, the court advised the defendant that he was charged with larceny in the first degree and larceny in the second degree, and faced a maximum penalty of twenty years in prison. The court stated to the defendant that he needed an attorney. The court stated also that "[i]t does no one any good to come into this . . . representing themselves . . . [e]ven if you were a lawyer."

When the defendant informed the court that he was unable to retain counsel because he lacked accessible funds, on February 25, 2009, Judge Dennis referred the defendant to the Office of the Public Defender to apply for assistance. The defendant failed to complete the application. Moreover, the information that he provided indicated that he had posted bond and that a business account contained funds of at least $10,000, which made him ineligible for a public defender.

On March 26, 2010, Judge Hudock identified at least eleven continuances the court had granted the defendant so he could retain counsel. The court thereafter found that "for all intents and purposes," the defendant had waived his right to counsel, but appointed Popilowski as standby counsel for the defendant. To help the defendant understand the nature of the proceedings, the court ordered the defendant to observe both a jury and a court criminal trial.

The transcript of the March 26, 2010 proceeding demonstrates that the defendant understood his right to counsel and the importance of legal representation. When he responded to the court's invitation to engage voluntarily in plea negotiations, the defendant stated: "It is wise to do that with counsel," and then, "[n]o." When he learned the terms of the proposed plea agreement, however, the defendant changed his mind and was willing to consider the offer. The court continued the matter until 2 p.m. at which time the defendant stated: "I would like to move forward with the offer. . . . And I did have a chance to talk to those who, I would say, advise me." Moreover, during the court's

canvass of the defendant as to his guilty plea, the defendant stated that he understood that he was giving up the right to counsel, a trial to the court or a jury, the right to continue to deny he committed the offenses, the right to have the state prove its case beyond a reasonable doubt, the right to remain silent, to confront witnesses against him, to present witnesses on his own behalf, and to present a defense. In giving up those rights, the defendant affirmed that he wanted to do so. He also stated that no one had threatened him to take the plea offer and that his plea was voluntary. The defendant stated as well that he was pleading guilty because he was guilty. The court then found that the defendant's guilty plea was knowing, voluntary and intelligent, and that he knowingly, voluntarily, and intelligently waived his right to counsel.

This is not the first time this court has been presented with a claim that the trial court violated a criminal defendant's constitutional right to counsel.[26] *State* v. *Flemming*, supra, 116 Conn. App. 469, recounts a procedural history remarkably similar to the present one.[27] Notably, the defendant in *Flemming* also failed to object at trial and sought reversal of the judgment revoking his probation pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). *State* v. *Flemming*, supra, 477. Although the facts and procedural history of *Flemming* are on point, there are circumstances unique to this case that provide further evidence that the defendant accepted the plea agreement voluntarily, namely, that the court twice vacated the defendant's guilty plea and the defendant three times represented to the court that he wanted to proceed with the plea agreement. Moreover, after the court canvassed the defendant for a second time, the defendant raised questions concerning who determined that he should pay $25,000 in restitution prior to sentencing, which is evidence that the defendant considered his guilty plea intelligently. At sentencing, the defendant represented that he was a college graduate and that he had been involved in several successful businesses. The court found that the defendant was an intelligent person and that he intelligently, knowingly, and voluntarily waived his right to counsel. Pursuant to our review of the record and considering the particular circumstances of this case, we conclude that the court did not abuse its discretion in finding that the defendant knowingly, intelligently, and voluntarily waived his right to counsel. Moreover, the court did not violate the defendant's right to counsel.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] In a second file, the defendant was charged with larceny in the second degree in violation of General Statutes (Rev. to 2007) § 53a-123 and issuing a bad check in violation of General Statutes § 53a-128 (bad check case). The complainant in the bad check case is a dentist. After the defendant was sentenced in the larceny case, the state entered a nolle prosequi in the bad check case.

[2] Although the defendant claims that the court violated his rights to counsel under both the federal and state constitutions, he concedes that his right under our state constitution is coextensive with the federal constitution. We therefore review his claim pursuant to the sixth amendment to the United States constitution. See *State* v. *Geisler*, 222 Conn. 672, 684–86, 610 A.2d 1225 (1992).

[3] The state contends that we should not review the defendant's claim because he waived his right to counsel by agreeing to the granting of the motion to withdraw. The defendant recognizes that his claim is unpreserved and seeks to prevail on appeal pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). We will review the defendant's claim because the record is adequate for our review and the claim is of constitutional magnitude. See *State* v. *T.R.D.*, 286 Conn. 191, 198 n.9, 942 A.2d 1000 (2008). As explained herein, however, the defendant cannot prevail because a constitutional violation does not clearly exist. See *State* v. *Golding*, supra, 239–40.

[4] Sergeant David Collins of the Wilton Police Department signed an affidavit in support of an arrest warrant for the defendant. Collins attested in part: "[O]n 11/26/2008, Ms. Pauline Gamer provided a written statement which attested to the following; that in December of 2006, she along with her daughter Nancy Gamer had opened a line of credit at the Washington Mutual Bank . . . in Wilton . . . . That the total sum of the credit line was $250,000. That Pauline Gamer has learned that her son, [the defendant] . . . was drawing funds from the account in which he was not authorized.

"That Nancy Gamer also provided a written statement which indicated that [the defendant] was not authorized to make withdrawals from the account. That Nancy Gamer also indicated that she believed that [the defendant] removed the monthly statement from Pauline's mailbox in an attempt to conceal his activity from his mother. That [the defendant], Nancy and Pauline all resided at the same residence . . . in Wilton. That the activity came to light in April of 2008, as the bank contacted Nancy regarding delinquent payments on the account. That a total of $227,863.24 was withdrawn by [the defendant]. That Pauline Gamer continued to make payments on the account in order to protect her son. That Nancy Gamer prompted her mother Pauline to discontinue making payments and to report this incident to law enforcement.

"That on 12/4/2008, this affiant spoke with Walter Mann, an investigator with Washington Mutual. That . . . Mann confirmed that [the defendant] was not on the loan agreement and did not have authority to make withdrawals on the account. That Mann confirmed that [the defendant] had withdrawn over $227,000 on the account. That Mann indicated that Pauline Gamer continued to make installments on the account. That Mann also advised that the bank manager at the time of these withdrawals was . . . terminated as a result of this incident."

[5] Following the luncheon recess, the defendant represented that he was unable to obtain the necessary information. His reasons were many, e.g., he moved and his personal records might be in storage, he was unable to reach his accountant, his bank does not provide certain statements and he banks online. The court suggested that the defendant simply print out his online bank statement.

[6] The court ordered the defendant to remain "in court for this afternoon's court trial. You are to observe that trial this afternoon. If you are going to be trying your case, the court sees that it is necessary that you observe a trial. It is a court trial, but you at least will have the opportunity to observe the conduct of the presentation of evidence. The court finds that that is necessary in your situation. So, you are ordered to be back in court, in this court, at 2 [p.m.]. And I will also indicate that you are to be here each day next week at 10 [a.m.] for either observations of the court trial, or your own trial, whichever is scheduled."

[7] The court stated: "I am willing to do the following, and we would continue the matter for sentencing, with a presentence report. So, I could put this out for a lengthy period of time. My offer to you would be a suspended sentence with probation, if in fact $25,000 had been paid to, and confirmed to be paid, to the victim. If that is done, you would receive a suspended sentence and probation with a condition of restitution for the remaining amount."

[8] Vieux stated that the not-to-exceed restitution sum was $234,933.24, which represented the sum owed in the larceny case and the bad check case.

[9] Vieux stated: "This was an warrant arrest, Your Honor, by the Wilton Police Department. [November 26, 2008], a Ms. Pauline Gamer provided a written statement, indicating that she had in December of 2006, along with

her daughter, opened a line of credit at the Washington Mutual Bank located [on] Danbury Road in Wilton. The total line of credit was $250,000. She subsequently learned that her son, the defendant . . . was drawing funds from that account; he was not authorized to do so. When they did a full accounting, Your Honor, and alike, and it was revealed that a total of $227,863.24 was withdrawn by [the defendant] at the time. She did in fact make payments, in order to protect her son, at one point, and then subsequently discontinued making payments.

"And then, again, revealed through the investigation, Your Honor, that in fact no documentation showing authorization and alike was provided. He wasn't allowed, withdraw the funds, no right or reason to do so, withheld them from the complainant, Your Honor."

[10] Before canvassing the defendant, the court stated: "All right, Mr. Gamer, what happens now is that I am going to ask you a series of questions. If you need any help, since you are not represented by counsel, but I will try to answer your questions, understanding that I do not represent you, as well." The defendant responded, "Right."

[11] The following colloquy transpired, in part, during the canvass:

"The Court: And you are also giving up the following rights. You are giving up the right to have a trial before a court or a jury; *with the assistance of your attorney*. You are giving up the right to continue to deny that you committed this offense and the right to force the state of Connecticut to prove that you did. The state would have to prove your guilt in trial beyond a reasonable doubt. Furthermore, you are giving up the rights to remain silent, to confront witnesses, to present witnesses on your own behalf, to testify and to present defenses. Do you understand that you are giving up those rights?

"The Defendant: Yes, sir.

"The Court: That is what you wish to do?

"The Defendant: Yes, sir. . . .

"The Court: *Has anyone made any threats* or promises to you, that are forcing you to reach this agreement and enter your plea?

"The Defendant: No.

"The Court: So, your agreement and *your plea are voluntary*, is that correct?

"The Defendant: Sure.

"The Court: The state of Connecticut put on the record facts which led to your arrest. Are those *facts essentially correct*?

"The Defendant: Yes, sir.

"The Court: So, you are pleading guilty because you are guilty?

"The Defendant: Yes, sir.

"The Court. Any questions about your plea?

"The Defendant: I have a lot, but I don't think this is the—no, I do not.

"The Court: All right. So, you do not have any questions about your plea of guilty at this point, or about the agreement?

"The Defendant: Correct." (Emphasis added.)

[12] The court stated to the defendant: "you may wish to still accept the [plea] agreement, at which point I will put you to plea again, and I will ask you all of those questions again. The additional questions I will ask you pertain to, principally, the elements of the offense of larceny in the first degree and whether you understand them, and also whether you understand what the maximum penalties are for larceny in the first degree. That's the only . . . change in this proceeding."

[13] The following colloquy took place between the court and the defendant:

"The Court: [T]he bottom line is this: it's going to be restitution.

"The Defendant: Right.

"The Court: So that you understand before we go any further.

"The Defendant: Okay.

"The Court: It'll be restitution not to exceed $234,933.24. That's to include both files.

"The Defendant: Right.

"The Court: As verified by the probation department. Which means that if probation evaluates the entire restitution issue, including whatever experts you can present, whatever documents you can present to the probation department and whatever else results . . . in their conclusion that you owe a certain figure, that's what we mean by as verified by the probation department.

"The Defendant: Okay.

"The Court: And I think that's what you meant by probation doing an accounting, is that correct?

"The Defendant: True.

"The Court: Because that doesn't sound like my language. But what does sound like my language is, as verified by the probation department.

"The Defendant: Right.

"The Court: So, you are perfectly free to present to the probation department what you believe is an accurate figure. That does not mean, though, that probation, when its entire investigation is finished, is going to say, oh yeah, we agree with you. It's an investigation that will include whatever you present to them. They may, bottom line, may conclude that you owe that amount.

"The Defendant: Right.

"The Court: But you're pleading guilty to [larceny in the first degree]. Your maximum liability is $234,933.24 unless the probation department says it's lower. Do you understand that?

"The Defendant: Sure, yeah.

"The Court: And you're willing to agree to that?

"The Defendant: Yeah.

"The Court: Just as long as we know what the agreement is? . . .

"The Defendant: Okay. I've never seen anything. I don't have any files. I don't know—other than, I've received some information on some checks. And when I looked at the evidence, there are copies of copies in there, and there's been no verification; even two or three of those checks in there were written out of her account to these third parties. There's—as far as I know, I have not seen any of the evidence against me. So, that's the reason why I'm asking for the probation department to take a look at [it] because it would be unbiased. . . .

"The Court: So, it may be that you wish to present, you may still differ with the figure and you may wish to present to me evidence to the contrary. That is your right to do in your sentencing statement. So, I will consider that as well. But I will tell you right now that I will have to confer with the prosecutor, who will make a statement on the record. I don't confer with the prosecutor, but they will make a statement on the record as to what they feel your restitution should be. And I will have to discuss it with the probation department. So, the probation department will be present.

"The Defendant: Okay.

"The Court: So, just understand that, again, I need input from everybody, not just what you're telling me or not just what the state's telling me. I have the big picture to look at.

"The Defendant: Okay.

"The Court: So, any other questions?

"The Defendant: No, sir."

There was continued discussion of the amount of the restitution owed. The court ultimately stated: "[I]n principle, that if, in fact, if, in fact, the probation department after complete investigation determined that restitution in this figure was substantially wrong and that you fell below the threshold for larceny in the first degree, I'd allow you to vacate your plea, in principle. But I could see a lot of variations and a lot of variables in that."

[14] The court explained to the defendant why it ordered him to observe a criminal trial. "[I]f there is no agreement . . . I will order you to be in court on Monday, and by the way, I did this only because you are unrepresented. And the only way that you are going to learn about trials is to sit in and watch the trials that will proceed on Monday and . . . there's another trial we have scheduled for Tuesday. And you'll come in and you'll watch every one of these trials. And when they are done, we will proceed with your trial.

"So, I mean, I'm telling you why I did what I did in light of the fact that you are unrepresented. And if you are still not in agreement with this plea disposition, then I will appoint counsel to, as we did before; counsel will sit by your side during your trial as in assistance, but not as your lawyer, all right. So, the $25,000, as I understood it, was a figure worked out between you and prosecutor Vieux. And that's why I accepted the plea in the first place."

[15] The court recounted the procedural history of the case. "You may not recall, sir, but I do. So, don't accuse the court of speeding things up. You have suddenly indicated that you had no prior knowledge of this $25,000 figure before I just threw it out to you when you plead[ed] guilty to this charge. At that point, when you make a statement like that, I cannot find your plea to be a knowing, voluntary, and intelligent plea. So, don't start pulling this game, sir, that I'm speeding things up.

"You, sir, indicated that your plea wasn't knowing, it wasn't voluntary, it wasn't intelligent. At that point, either you work out some kind of disposition

or it goes on trial. It's the . . . one of the oldest cases on our jury list. Don't start accusing me of speeding things up when this matter has been pending since, I believe, 2008. Don't start accusing me of speeding it up when it's the oldest matter on the jury docket. I have given you continuance after continuance to get yourself a lawyer. . . .

"You've indicated that you are in the process of retaining a forensic accountant. You've indicated that you have a legal adviser, but you have refused, in the court's opinion, you have refused to hire an attorney all of this time. Do not accuse me of speeding this up. This is your right to have a speedy trial. I don't want to hear that again, sir, because it tells me that you may be playing games, and I'm not going to play games. I'm giving you your right to a trial.

"I have indicated, because of your insistence on not hiring a lawyer, that you must sit in court and watch other cases being tried. That is for your benefit because of your insistence on not hiring an attorney. Two days ago, you inferred that I was ordering you to come into court. Sir, it is for your own benefit because you are not an attorney. And I'm not going to have you come back on a habeas, if you're convicted, sitting in prison, and saying somehow or other this was all ineffective assistance because you couldn't get a public defender. You couldn't hire a lawyer. You were forced to go to trial. You didn't know the first thing about trial. I'm giving you the opportunity to start to find out what trials are all about.

"But again, as I've said before, it's apparent to me—it's become more apparent to me as time has gone on, that you are perfectly capable of hiring an attorney, and you simply refuse to hire an attorney. If that's the case, you're going to sit here in the courtroom and you're going to watch other cases being tried, and we aren't speeding this up. This case should have been tried a long time ago."

[16] The victims who were present and made a statement were Michael Hodish, a dentist and childhood friend of the defendant, and Nancy Gamer and Ellen Gamer Wink, the defendant's sisters. Pauline Gamer, the defendant's seventy-seven year old mother, was not present.

[17] The defendant stated, in part: "I said [to my mother] we've got this project working along. I need to send money for engineering work to Efficient. And so checks were cut and sent directly to the engineering firm. Never did I walk into a bank and instruct somebody to do something that wasn't first verified by my mom. And I don't know why my mom is saying that she didn't approve this, when in fact she approved this with me because we had worked on projects time and time again behind my sisters because she didn't want them to be involved. She said, you do it. I'll keep your sisters informed. Just get the work done."

[18] The defendant stated with regard to his mother: "She had so alienated the people that were renting her nursing home with multiple lawsuits that they didn't want to—they didn't want to participate at all in anything that she wanted to do. It was my responsibility to go in there and solve these major issues with my attorney, Peter Finn, from Rubin & Rugman and James Heller, an accountant in Boston. Neither of these people knew my mom, and my mom did not have anything to do with making sure they stayed on the case."

[19] The defendant stated that he was successful in helping his mother deal with issues concerning the nursing home. "That threw off $1.8 million to my mom. Okay. . . . [T]hat's a considerable amount of money when you think about the fact that they're saying that they suffered incredible hardship from a $200,000 amount of money that my mom gave me because she . . . accidentally left me out of the compensation from the sale of the group home, which was 900 was needed for all these other parties, plus $200,000 that was basically in—she said I need 900. Whatever you can get over that is yours. I had been paid nothing, all right, and I spent hours and hours over there."

[20] The court sentenced the defendant as follows: "Based upon your failure to make that initial restitution in the amount of $25,000, I have no choice but to sentence you in accordance with your agreement to enter an open plea. It is the sentence of this court that you be committed to the custody of the Commissioner of Correction for a period of ten years. Execution of that sentence is suspended after three years to serve. You are then to be placed on a period of probation for five years. Condition of that probation will be restitution . . . not to exceed $234,933.24. That restitution, of course, is to be verified by the probation department. In addition, you are not to have any contact with the complainants. You are not to enter the property of the complainants during the period of probation."

The clerk provided the defendant with certain papers. Krusinski stated that the state was going to enter a nolle prosequi on the bad check charges.

[21] In his petition for a writ of habeas corpus, the petitioner alleged that he was denied the assistance of counsel with respect to the charge of larceny in the first degree. He sought to have his guilty plea and sentence vacated, and the matter restored to the criminal docket.

[22] Practice Book § 3-10 provides in relevant part: "(a) No motion for withdrawal of appearance shall be granted unless good cause is shown and until the judicial authority is satisfied that reasonable notice has been given to other attorneys of record and that the party represented by the attorney was served with the motion and the notice required by this section or that the attorney has made reasonable efforts to serve such party. . . .

"(b) . . . a motion to withdraw shall include the last known address of any party as to whom the attorney seeks to withdraw his or her appearance and shall have attached to it a notice to such party advising of the following: (1) the attorney is filing a motion which seeks the court's permission to no longer represent the party in the case; (2) the date and time the motion will be heard; (3) the party may appear in court on that date and address the court concerning the motion . . . .

"(c) In criminal . . . matters, the motion to withdraw shall comply with subsections (b) (1), (2) and (3) of this section and the client shall also be advised by the attorney that if the motion to withdraw is granted the client should request court appointed counsel, obtain another attorney or file an appearance on his or her own behalf with the court and be further advised that if none is done, there may be no further notice of proceeding and the court may act.

"(d) In addition to the above, each motion to withdraw appearance and each notice to the party . . . the subject of the motion shall state whether the case has been assigned for pretrial or trial and, if so, the date so assigned. . . ."

[23] Sherman filed his motion to withdraw on September 24, 2009, but the court did not hear it until October 29, 2009. Although the case was on the trial list, it had not been set down for a date certain for trial. We do not conclude that the motion to withdraw was untimely. Compare *State* v. *Patavino*, 51 Conn. App. 604, 609, 724 A.2d 514 (no right to withdraw on eve of or during trial), cert. denied, 249 Conn. 919, 733 A.2d 236 (1999).

[24] The defendant in *Fernandez* also did not preserve his claim for appeal and sought to prevail under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). *State* v. *Fernandez*, supra, 254 Conn. 648.

[25] The defendant relies on *T.R.D.* to support his claim that he did not voluntarily and knowingly waive his right to counsel. That case is distinguishable from the facts here. The trial court in *T.R.D.* did not inform that defendant of punishment he faced if convicted. See *State* v. *T.R.D.*, supra, 286 Conn. 201–202. Here, Judge Hudock informed the defendant that he faced twenty years in prison and a $15,000 fine.

[26] See *State* v. *Harman*, 198 Conn. 124, 130, 502 A.2d 381 (1985) (defendant's obstreperous behavior materially contributed to delay in appointment of new counsel); see also *State* v. *Wolff*, 237 Conn. 633, 657, 659, 678 A.2d 1369 (1996) (defendant comprehended nature of charges and facts, and court informed defendant of right to assistance of counsel).

[27] In *Flemming*, the defendant was arrested on a charge of violation of probation. When he appeared for the violation of probation hearing, the court, *Alander, J.*, asked the defendant if he desired the assistance of counsel and whether he had applied for a public defender's assistance. *State* v. *Flemming*, supra, 116 Conn. App. 472–73. The defendant told the court that he wanted private counsel but had not been able to obtain funds to do so and that he did not want a public defender to represent him. Id. Judge Alander noted that the case had been continued for eight months and stated that perhaps the defendant had not tried his best to retain counsel because he was out on bond. Id., 473. The court recessed to permit the defendant to apply for a public defender. Id. When he learned that the defendant refused to apply for a public defender, Judge Alander reviewed for the defendant his right to counsel, including appointed counsel if he were indigent, the dangers of proceeding without counsel, the nature of the proceedings, the charges against him and the potential punishment. Id., 474. The defendant insisted that he would hire an attorney. Id., 474–75. The court continued the matter once more and admonished the defendant that if he did not have a lawyer to represent him on the next court date, he would have to represent himself, as the court would find that he had waived his right to counsel. Id., 475.

One month later, the defendant appeared without counsel. Id. He told the court that he had not been able to raise the money he needed to retain counsel. Judge Alander asked the defendant if he planned to represent himself; the defendant stated: "I plan to." Id. The court recessed to permit the defendant to complete an application for a public defender. When court reconvened, a public defender informed the court that the defendant had not completely filled out the application. Id. Moreover, because he had posted a $200,000 bond, he was ineligible for a public defender. Id.

Judge Alander addressed the defendant as follows: "[S]ince you're not eligible for a public defender and you haven't obtained private counsel, at this point you will need to represent yourself. I find that your failure to obtain private counsel means that you effectively waived your right to the assistance of counsel. You have been given months and months and months to obtain private counsel, and unfortunately you have not done so. And I'm not in a position at this point to continue this matter any further." (Internal quotation marks omitted.) Id., 476. Judge Alander explained the procedures he would follow at the hearing, the charges against the defendant, and his right to the presentation of the case. Id. After Judge Alander found that the defendant had violated his probation and sentenced him, the defendant appealed. Id. On appeal, he claimed that the court improperly found that he effectively had waived his right to the assistance of counsel, as he had not clearly and unequivocally expressed a desire to represent himself. Id., 477. This court disagreed, concluding that the defendant, "by means of his actions, voluntarily and knowingly waived his right to counsel." Id., 480.

––––––––––––––––––––––––––––––––